**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| SAMANTHA SMITH AND ROBERT MEANS, | § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 6:24-CV-00336-JCB |
| | § | |
| UNITED STATES DEPARTMENT OF THE TREASURY, JANET YELLEN, in her official capacity as Secretary of the Treasury, THE FINANCIAL CRIMES ENFORCEMENT NETWORK, and ANDREA GACKI, in her official capacity as Director of FinCEN, | § § § § § § § § | |
| *Defendants.* | § | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RELIEF UNDER
5 U.S.C. § 705**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ 4

INTRODUCTION ............................................................................ 7

STATEMENT OF FACTS ................................................................. 7

    *The Corporate Transparency Act* ........................................... 7

    *The Implementing Rule* ....................................................... 9

    *Plaintiffs' Injuries* ............................................................. 10

STANDARD .................................................................................. 11

ARGUMENT ................................................................................ 11

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............... 11

    A.    The CTA does not directly regulate interstate commerce ............... 13

    B.    The CTA is neither necessary to, nor proper for, the regulation of interstate commerce ......................................................... 14

        1.    The CTA is not plainly adapted to the regulation of interstate commerce .......................................................... 14

            a.    The CTA does not regulate economic activity ................ 15

            b.    The CTA lacks a jurisdictional element limiting its requirements to entities engaged in or substantially affecting interstate commerce ................... 16

            c.    The CTA lacks Congressional findings showing the effect of the regulated activity on commerce among the States ............................................... 17

            d.    Any link between the CTA and interstate commerce is too attenuated for the CTA to be a "necessary" extension of Congress's interstate commerce power ................................................. 18

        2.    Even if the CTA is a "necessary" extension of the interstate commerce power, it is not "proper." ...................... 19

II.    PLAINTIFFS WILL BE IRREPARABLY HARMED BY THE CTA ......... 20

III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION AND STAY ........................................................ 21

CONCLUSION .............................................................................. 21

**CERTIFICATE OF SERVICE** .......................................................................... 22

**CERTIFICATE OF CONFERENCE** ................................................................... 23

TABLE OF AUTHORITIES

*Cases:*                                                                                              *Page(s):*

*Bittner v. United States,*
        598 U.S. 85 (1983) ........................................................................................ 16

*BST Holdings, L.L.C. v. OSHA,*
        17 F.4th 604 (5th Cir. 2021) ......................................................................... 20

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
        511 F.3d 535 (6th Cir. 2007) ......................................................................... 20

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
        561 U.S. 477 (2010) ....................................................................................... 20

*GDF Realty Invs., Ltd. v. Norton,*
        326 F.3d 622 (5th Cir. 2003) ......................................................................... 15

*Gonzales v. Raich,*
        545 U.S. 1 (2005) ....................................................................... 13, 14, 15, 19

*Groome Resources, Ltd. v. Parish of Jefferson,*
        234 F.3d 192 (5th Cir. 2000) ......................................................................... 15

*Janvey v. Alguire,*
        647 F.3d 585 (5th Cir. 2011) ......................................................................... 11

*McCulloch v. Maryland,*
        17 U.S. (4 Wheat.) 316 (1819) ................................................................. 14, 19

*Nat'l Small Bus. United v. Yellen,*
        No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205
        (N.D. Ala. Mar. 1, 2024) ............................................................................ 7,12

*New York v. United States,*
        505 U.S. 144 (1992) ....................................................................................... 19

*NFIB v. Sebelius,*
        567 U.S. 519 (2012) .......................................................................... 14, 19, 20

*Nken v. Holder,*
        556 U.S. 418 (2009) ................................................................................. 11, 21

*Piazza's Seafood World, LLC v. Odom,*
        448 F.3d 744 (5th Cir. 2006) ......................................................................... 13

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................................ 19

*Russello v. United States,*
    464 U.S. 16 (1983) ......................................................................... 16

*Terkel v. CDC,*
    521 F. Supp. 3d 662 (E.D. Tex. 2021), *appeal dismissed as moot*
    *Without vacating judgment*, 15 F.4th 683 (5th Cir. 2021) .................. 13, 15, 16

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ......................................................... 11

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ......................................................... 21

*Trans World Airlines v. Mattox,*
    897 F.2d 773 (5th Cir. 1990) ......................................................... 21

*Trustees of Dartmouth College v. Woodward,*
    17 U.S. (4 Wheat.) 518 (1819) ....................................................... 12

*United States v. Lopez,*
    514 U.S. 549 (1995) ...................................................... 12, 14, 15, 17, 18, 20

*United States v. Morrison,*
    529 U.S. 598 (2000) ...................................................... 14, 15, 16, 17, 18

*Wages & White Lion Investments, LLC v. United States FDA,*
    16 F.4th 1130 (5th Cir. 2021) ....................................................... 20

**Constitutional Provisions:**

U.S. Const. art. 1, § 8 .......................................................................... 12

U.S. Const. art. 1, § 8, cl. 3 ................................................................. 13

U.S. Const. art. 1, § 8, cl. 18 ............................................................. 12, 14

U.S. Const. amend. X ........................................................................... 12

**Statutes, Regulations & Codes:**

5 U.S.C.
    § 705 .......................................................................................... 11

31 U.S.C.
    § 5335(a)(1) ................................................................................ 16
    § 5336 .......................................................................................... 7

§ 5336(a)(2) ............................................................................................ 8

§ 5336(a)(3) ............................................................................................ 8

§ 5336(a)(11) ..................................................................................... 8, 10

§ 5336(a)(11)(A)(i) ............................................................................... 9

§ 5336(a)(11)(B)(xix) .......................................................................... 9

§ 5336(b) ................................................................................................. 7

§ 5336(b)(1)(A) ...................................................................................... 8

§ 5336(b)(1)(B) ...................................................................................... 8

§ 5336(b)(1)(C) ...................................................................................... 8

§ 5336(b)(1)(D) ............................................................................... 8, 11

§ 5336(b)(2)(A) ...................................................................................... 8

§ 5336(c)(1) ............................................................................................ 8

§ 5336(c)(2)(B) ...................................................................................... 8

§ 5336(c)(2)(B)(i)-(ii) .......................................................................... 8

§ 5336(c)(2)(B)(i)(II) ........................................................................... 8

26 C.F.R.

§ 301.6109-1(a)(1) ............................................................................. 10

31 C.F.R.

§ 1010.380(a)(1)(i)-(ii) ........................................................................ 8

§ 1010.380(a)(1)(iii) ....................................................................... 8, 11

§ 1010.380(b)(1)(ii)(E) ........................................................................ 9

§ 1010.380(b)(1)(i)(F) ....................................................................... 10

§ 1010.380(c) ....................................................................................... 10

§ 1010.380(d)-(e) ................................................................................. 9

Tex. Tax Code § 171.203 ........................................................................ 11

**Other Authorities:**

2 The Records of the Federal Convention of 1787 (Max Farrand ed., 1911) ............ 12

William M. (Mac) Thornberry National Defense Administration Act for
Fiscal Year 2021, Pub. L. No. 116-283 § 6402,
134 Stat. 3388, 4604 (2021) ........................................................ 7, 17

*O Brother, Where Art Thou?* (Touchstone Pictures 2000) (scene available at
https:tinyurl.com/2zkem5an) ......................................................... 18

Plaintiffs respectfully move the Court for a preliminary injunction enjoining the United States Department of the Treasury and the Financial Crimes Enforcement Network (FinCEN) from enforcing the Corporate Transparency Act (CTA). Plaintiffs also move for a stay pending review of FinCEN's final rule implementing the CTA, issued on September 30, 2022.

## INTRODUCTION

This case involves a constitutional challenge to a federal mandate that requires Plaintiffs to disclose a host of private information to federal law enforcement, even though they are not suspected of a crime and are not engaged in any foreign or interstate commerce that would subject them to federal jurisdiction.

This mandate was recently declared unconstitutional and enjoined by the U.S. District Court for the Northern District of Alabama. *Nat'l Small Bus. United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205, at \*59 (N.D. Ala. Mar. 1, 2024). But that injunction was limited to the parties in that case. Because the challenged mandate takes effect on January 1, 2025 (just over three months from now) Plaintiffs seek similar preliminary relief here to avoid irreparable harm while their case proceeds on the merits.

## STATEMENT OF FACTS

### *The Corporate Transparency Act*

On January 1, 2021, Congress enacted the Corporate Transparency Act (CTA). William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116–283, §§ 6401–03, 134 Stat. 3388, 4604–25 (2021) (codified at 31 U.S.C. § 5336). The CTA requires the "applicant" and beneficial owners of reporting companies send personal information to FinCEN. 31 U.S.C. § 5336(b). The CTA defines a "reporting company" as any entity created by filing a document with a secretary of state under the law of a state, or a foreign entity registered to do business within the United States, but exempts twenty-three types of entities based on their

activities (primarily those in the financial services sector). *Id.* § 5336(a)(11). An "applicant" is defined as an individual that forms a reporting company or registers it to do business in the United States. *Id.* § 5336(a)(2). A beneficial owner is an individual that owns or controls 25% or more of a reporting company or otherwise exercises substantial control over it. *Id.* § 5336(a)(3).

The CTA requires both an applicant and a beneficial owner report sensitive personal information to FinCEN. *Id.* § 5336(b)(1)(A). This includes the individual's name, date of birth, current address, and a unique identifying number from an identification document or a number issued by FinCEN. *Id.* § 5336(b)(2)(A). Once reported, this information is stored in a federal database that can be accessed by federal, State, local, tribal, and international law enforcement agencies. *Id.* § 5336(c)(2)(B). This information is held indefinitely; but it must remain in the database for at least five years after a reporting company has been terminated. *Id.* § 5336(c)(1). FinCEN does not need a court order when a federal agency requests information from the database, including when the federal agency is making a request on behalf of a foreign government. 31 U.S.C. § 5336(c)(2)(B)(i)–(ii). The CTA only requires court authorization to disclose information to State, local, or tribal law enforcement agencies. *Id.* § 5336(c)(2)(B)(i)(II).

For entities formed before January 1, 2024, this information must be reported by January 1, 2025. *Id.* § 5336(b)(1)(B); 31 C.F.R. § 1010.380(a)(1)(iii). For entities formed on or after January 1, 2024, this information must be reported within 30 days of formation or registration to do business in the United States. 31 U.S.C. § 5336(b)(1)(C); 31 C.F.R. § 1010.380(a)(1)(i)–(ii). Reporting entities have an ongoing obligation to report changes in beneficial ownership within one year of the change. 31 U.S.C. § 5336(b)(1)(D). A person who does not make one of the CTA's required reports is subject to civil penalties up to $500 per day and criminal penalties up to a $10,000 fine and two years in prison. *Id.* § 5336(h)(1), (3).

The definition of "reporting company" for U.S.-based entities is singularly dependent on an entity being formed by "filing [] a document with a secretary of state." *Id.* § 5336(a)(11)(A)(i). The CTA does not require any nexus to commerce, much less interstate or foreign commerce. *See id.* Nor is the CTA's coverage limited to entities that have or could have a federal tax liability. *Id.*, *but see id.* § 5336(a)(11)(B)(xix) (exempting I.R.C. § 501(c) nonprofits, political organizations, and trusts). Stated differently, the CTA reaches every corporate entity that exists within the United States unless it is specifically exempt.

### *The Implementing Rule*

FinCEN published a final rule implementing the CTA on September 30, 2022. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498 (Sept. 30, 2022) (codified at 31 C.F.R. pt. 1010) (the "CTA implementing rule"). The CTA implementing rule largely mirrors the CTA's requirements and provides additional details on compliance methods. Because the CTA conditioned the reporting requirement effective date on when the regulations are issued, 31 U.S.C. § 5336(b)(1), the implementing rule provided the exact compliance dates for the CTA. The implementing rule also expands the CTA's scope in several ways.

The CTA implementing rule expands the definitions of "applicant" and "beneficial owner" beyond the statutory definitions to include additional individuals who are subject to the CTA's reporting requirement. *Compare* 31 U.S.C. § 5336(a)(2)–(3) *with* 31 C.F.R. §1010.380(d)–(e). The implementing rule also requires submitting an image of the identification document required by 31 U.S.C. § 5336(b)(2)(iv)(I). 31 C.F.R. § 1010.380(b)(1)(ii)(E). In addition, the implementing rule requires the report to include information about the entity itself—something the CTA does not require. *Id.* § 1010.380(b)(1)(i). Although this requirement may seem self-evident, FinCEN is using this expansion to request additional highly sensitive information—*i.e.*, social security numbers—from small business owners. The implementing rule requires the

report include the entity's taxpayer identification number (TIN). *Id.* §
1010.380(b)(1)(i)(F). In the case of a LLC without employees—which the IRS does
not require to obtain an Employer Identification Number—this TIN requirement
means the report must include the applicant and owner's social security number. *See*
26 C.F.R. § 301.6109-1(a)(1); Internal Revenue Service, Taxpayer Identification
Numbers (TIN), https://www.irs.gov/individuals/international-taxpayers/taxpayer-
identification-numbers-tin (last visited Aug. 22, 2024).

### Plaintiffs' Injuries

Plaintiffs own entities covered by the CTA and its implementing rule. Plaintiff
Samantha Smith owns a single rental property located at 4831 Calhoun Canyon Loop,
Austin, Texas 78735. Ex. 1. After her husband and her husband's parents passed
away, Ms. Smith decided to utilize the former home of her in-laws (the Property) as
a rental property in order to provide for her children. *Id.* To protect herself and her
family, in 2021 Ms. Smith formed Sage Rental Properties, LLC d.b.a. 4831 Calhoun
Canyon Loop (Sage Rental). *Id.* The Property is the only real property or asset Sage
Rental manages. *Id.* Sage Rental does not buy, sell, or trade, goods or services in
interstate commerce. *Id.* Nor does Sage Rental own any interstate or foreign assets.
*Id.* Nevertheless, Sage Rental is covered by the CTA and the implementing rule. *See*
31 U.S.C. § 5336(a)(11); 31 C.F.R. § 1010.380(c).

Plaintiff Robert Means owns 2367 Oak Alley, LLC (Oak Alley). Ex. 2. Oak
Alley exists as a holding company to manage a single office building in Tyler, Texas.
*Id* . Oak Alley does not buy, sell, or trade, goods or services in interstate commerce.
*Id.* Nor does Oak Alley own any interstate or foreign assets. *Id.* Nevertheless, Oak
Alley is covered by the CTA and the implementing rule. *See* 31 U.S.C. § 5336(a)(11);
31 C.F.R. § 1010.380(c).

Because Plaintiffs' entities are covered by the CTA, Plaintiffs are required to
disclose sensitive, personally identifiable information to FinCEN that they would not

be required to disclose under Texas law.  *See* Tex. Tax Code § 171.203.  In addition to the privacy impacts of these disclosures, Plaintiffs will also be required to expend resources in preparing these reports and will be required to expend time and money in order to maintain the accuracy of the information as is required under both the Act and the Rule.  31 U.S.C. § 5336(b)(1)(D); 31 C.F.R. § 1010.380(a)(2).

Failure to meet these requirements by January 1, 2025, will subject Plaintiffs to $500 per day penalties and up to two years in prison.  31 U.S.C. § 5336(h)(3); 31 C.F.R. § 1010.380(a)(1)(iii).  Plaintiffs therefore seek preliminary relief from this Court.

## STANDARD

When deciding whether to grant a preliminary injunction or a stay pending review under 5 U.S.C. § 705, courts use a largely identical four-factor test.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting the "substantial overlap" between factors for a stay pending review and a preliminary injunction); *Texas v. EPA*, 829 F.3d 405, 424–36 (5th Cir. 2016) (considering the four *Nken* factors when staying an agency's action under 5 U.S.C. § 705).  Courts consider: (1) whether the movant has shown a likelihood of success on the merits; (2) whether the plaintiff "will be irreparably injured absent" preliminary relief; (3) whether preliminary relief "will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556 U.S. at 434; *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).  The first two factors "are the most critical."  *Nken*, 556 U.S. at 434.  The final two factors "merge" and are considered together if "the Government is the opposing party."  *Id.* at 435.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

To begin, Plaintiffs are likely to succeed on their claim that the CTA and its implementing rule (hereafter referred to collectively as the "CTA") exceed Congress's

enumerated powers.  Indeed, the Northern District of Alabama declared the CTA unconstitutional on these grounds several months ago.  *Nat'l Small Bus. United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205, at *59 (N.D. Ala. Mar. 1, 2024).

"The Constitution creates a Federal Government of enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552 (1995).  Article I, section 8 of the Constitution enumerates seventeen specific powers for Congress.  It also includes the residual "necessary and proper" power authorizing Congress to execute the Constitution's enumerated powers.  U.S. Const. art. I, § 8, cl. 18.  The Tenth Amendment confirms that any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

The regulation of corporate formation is neither explicitly nor implicitly among the federal government's enumerated powers.  *See* U.S. Const. art. I, § 8.  To the contrary, the Framers expressly rejected this power at the Constitutional Convention.  Virginia delegate James Madison introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 The Records of the Federal Convention of 1787, at 615 (Max Farrand ed., 1911).  This proposal was defeated 8 votes to 3. *Id.* at 616.  Instead, since the Founding, the states have been the sole entity with the power to regulate local corporate formation.  *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).

As is often the case, the government bases its novel expansion of federal power in the Commerce Clause.  But even when supplemented with the Necessary and Proper Clause, the Commerce Clause does not authorize the CTA.

**A.      The CTA does not directly regulate interstate commerce.**

The Commerce Clause grants Congress authority "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  But the CTA cannot be justified under the Commerce Clause, even when supplemented by the Necessary and Proper Clause.

The commerce power generally falls within three broad categories: (1) regulating channels of interstate commerce; (2) regulating instrumentalities of interstate commerce; and (3) regulating activities that substantially affect interstate commerce.[1]  *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005).

As discussed more fully below, the third category—the substantial effects test—arises from the Necessary and Proper Clause, rather than the Commerce clause alone.  *Terkel v. CDC*, 521 F. Supp. 3d 662, 670 (E.D. Tex. 2021) *appeal dismissed as moot without vacating judgment*, 15 F.4th 683, 685 (5th Cir. 2021).

Here, there is no reasonable dispute that the CTA does not regulate the channels or instrumentalities of interstate commerce—*i.e.*, it does not regulate traffic on highways, rivers and streams or the movement of people or products across state lines.  Rather the activity that triggers the CTA is corporate formation: an activity which occurs solely in one state and is solely a creature of state law.

Thus, to the extent the commerce power can be extended to justify the CTA at all, it may only do so under the "substantial effects test," which is governed by the Necessary and Proper Clause.  *Raich*, 545 U.S. at 17.

---

[1]      Courts often interpret the interstate and foreign commerce clauses together, given their adjacent presence in the same clause.  U.S. Const. art. I, § 8, cl. 3; *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006) (reading the dormant commerce clause the same in interstate and foreign contexts).

**B.   The CTA is neither necessary to, nor proper for, the regulation of interstate commerce.**

The Necessary and Proper Clause empowers Congress to "make all Laws which shall be necessary and proper for carrying into Execution [its enumerated powers]." U.S. Const. art. I, § 8, cl. 18.  As applied to the Commerce Clause, the Supreme Court has held that the Necessary and Proper Clause allows the federal government to regulate purely intrastate activities that substantially effect interstate commerce as a means to carry into execution its authority over interstate commerce.  *See Raich*, 545 U.S. at 22.

However, any invocation of this implied power must be examined "carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012).  If a court determines that the relationship to commerce is too tenuous, or that invoking the commerce authority is simply "pretext" to pass laws for other purposes, that court has the "painful duty" of ruling that the government's exercise of power is unsupported by the Necessary and Proper Clause and thus unconstitutional.  *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423 (1819).

To meet this burden, a restriction on intrastate activity must be both necessary—*i.e.,* "plainly adapted" to the regulation of interstate commerce—and proper—*i.e.*, consistent "with the letter and spirit of the constitution." *NFIB*, 567 U.S. at 537. The CTA fails both tests.

**1.   The CTA is not plainly adapted to the regulation of interstate commerce.**

As Justice Scalia explained in *Raich*, the "plainly adapted" standard effectively tracks the evidence-based, federalism-sensitive form of rational basis applied in *Lopez* and *Morrison*.  *See Raich*, 545 U.S. 1, 35–36 (Scalia, concurring).  This includes four "significant considerations:" (1) the economic character of the intrastate activity; (2) whether the regulation contains a "jurisdictional element" that may "establish whether the enactment is in pursuance of Congress' regulation of interstate

commerce;" (3) any congressional findings regarding the effect of the regulated activity on commerce among the States; and (4) attenuation in the link between the regulated intrastate activity and commerce among the States.  *United States v. Morrison*, 529 U.S. 598, 609–13 (2000); *see also Terkel*, 521 F. Supp. at 670 (E.D. Tex. 2021) (listing these four considerations).  The CTA does not meet any of these considerations.

### a.    The CTA does not regulate economic activity.

To begin, the CTA does not regulate economic activity.  In determining whether the regulated activity is economic, courts look "only to the expressly regulated activity" itself—*i.e.*, the activity that would trigger federal penalties.  *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 634 (5th Cir. 2003).  The motivations for the activity or its potential economic effects are immaterial for this part of the analysis.  *See id.* at 633.

While there is no bright line between what is and is not an "economic activity," the Supreme Court has provided some useful guidelines.  *See Lopez*, 514 U.S. at 567 (noting the line drawing problem).  For example, the Court in *Raich* defined economic activity as "the production, distribution, and consumption of commodities."  545 U.S. at 25.  The Fifth Circuit has sometimes taken a broader view, holding that a regulation targets economic activities when it regulates "the exchange of goods and services," *GDF Realty*, 326 F.3d at 629, or prohibits activities that prevent classes of individuals from engaging in commerce.  *See Groome Resources, Ltd. v. Parish of Jefferson,* 234 F.3d 192,  205–06 (5th Cir. 2000).

On the other end of the spectrum, simple possession of a piece of property has never been considered economic activity, even if it may be subject to regulation for other purposes.  *See, e.g.*, *GDF Realty*, 326 F.3d at 634 (exercise of possessory interest in property by removing unwanted species was not economic activity).

Here the action that triggers the CTA's requirements is filing papers with a secretary of state to form a corporate entity.  But applying for state legal protections is not, by itself, economic activity.  *Cf. Terkel*, 521 F. Supp. 3d at 672 (invoking state eviction proceedings was not economic activity).  The CTA therefore does not regulate economic activity.

### b.    The CTA lacks a jurisdictional element limiting its requirements to entities engaged in or substantially affecting interstate commerce.

The Court must next consider whether the law has an "express jurisdictional element which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce."  *Morrison*, 529 U.S. at 611–12.  A common example of such a "jurisdictional element" is a law that allows federal regulation only where the regulated item or person has traveled across state lines.  *Id*. at 613 n.5.

The CTA does not contain a jurisdictional element linking it to interstate commerce.  To the contrary, the CTA applies whether the entity formed is engaged in interstate activity or not.  This lack of any jurisdictional element appears intentional.  The U.S. Code section that immediately precedes the CTA includes a jurisdictional element.[2]  *See* 31 U.S.C. § 5335(a)(1) ("the term 'monetary transaction' . . . means the deposit, withdrawal, transfer, or exchange, <u>in or affecting interstate or foreign commerce</u>, of funds or a monetary instrument") (emphasis added).   Under the *expressio unius* canon, courts assume that when Congress uses a phrase in one place and not in another the omission is intentional.  *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed

---

[2]    Both sections are part of the Bank Secrecy Act (BSA), *see* 31 U.S.C. § 5311 note, and the Supreme Court reads BSA provisions together.  *Bittner v. United States*, 598 U.S. 85, 94 (2023) (applying the *expressio unius* canon to the BSA).

that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  This factor therefore cuts in favor of Plaintiffs.

> ### c.    The CTA lacks Congressional findings showing the effect of the regulated activity on commerce among the States

Next, Courts look to "express congressional findings regarding the effects upon interstate commerce." *Morrison*, 529 U.S. at 612 (quoting *Lopez*, 514 U.S. at 562–63). When, as in this case, the regulation is of non-economic activity, these findings need to show that the regulation is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561.

The CTA does not include *any* congressional findings—much less findings showing that a novel and invasive regulation of state corporate formation procedures is essential to a broader permissible regulation of interstate commerce, or that failure to impose federal regulations will substantially affect interstate commerce.

At most, the CTA provides a brief "sense of Congress" section which concludes (with no data or explanation) that: (1) many new corporations are formed throughout the various states each year, and (2) "malign actors" *could* potentially use these corporations for fraudulent purposes.   William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116–283, § 6402, 134 Stat. 3388, 4604 (2021).  But this "sense of Congress" section provides no explanation for the scope of this alleged problem or how the CTA would solve it.   Indeed, it provides no data, studies, findings, or explanation at all. More importantly, the "sense of Congress" section does nothing to connect these criminal issues with any broader effect on interstate commerce or a broader economic regulatory scheme.  These are not the sort of "findings" that are helpful to the *Lopez/Morrison* analysis.

**d.    Any link between the CTA and interstate commerce is too attenuated for the CTA to be a "necessary" extension of Congress's interstate commerce power.**

Finally, the Court must consider the "fit" between the facts in the record and any alleged effect on interstate commerce.  If the fit is too tenuous or requires the court to "pile inference upon inference" to arrive at the government's conclusions, then the Court will not find the requisite substantial effect.  *Lopez*, 514 U.S. at 567.  In conducting this analysis, the key consideration is whether the government's causal arguments contain any obvious limiting principle that would allow the Court to maintain the "distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18.

The CTA fails this test.  At bottom, the government's justification for the CTA is that: (1) malign actors can create corporations under state law, (2) some of these actors may use those corporations for crimes such as money laundering, (3) federal law enforcement targeting those crimes would be assisted by a federal registry, and therefore (4) the CTA is justified under the Commerce Power.

But that chain of inferences would justify federal regulation of virtually everything.  After all, virtually anything *can* be used to facilitate interstate or foreign crimes, and a federal database will always assist in federal crime fighting.  For example, anyone familiar with modern cinema knows that interstate convicts on the run *can* hide in barns. *O Brother, Where Art Thou?* (Touchstone Pictures 2000) (scene available at https://tinyurl.com/2zkem5an).  Under the government's reasoning, that alone would make the security and construction of barns a matter of interstate commerce subject to federal oversight.  Similarly, illegal aliens may stay in single family homes when they arrive here.  Under the government's argument, the federal government could therefore require every homeowner in the country (regardless of suspicion) to disclose a running log of all their guests each year as a means to better

enforce border policy.  The Necessary and Proper Clause does not allow this sort of unlimited expansion of federal power.

> ### 2.    Even if the CTA is a "necessary" extension of the interstate commerce power, it is not "proper."

Even if the government could show that the CTA's regulation is "necessary" under the four-part test above—which it cannot—this Court must also evaluate whether the regulation was "proper." *NFIB v. Sebelius*, 567 U.S. 519, 560 (2012); *see also Gonzales v. Raich*, 545 U.S. 1, 39 (2005) (Scalia, J., concurring) (adding the "proper" analysis as an additional consideration after the *Morrison* factors).

To be "proper," a regulation of intrastate conduct "may not be otherwise 'prohibited' and must be 'consistent with the letter and spirit of the constitution.'" *Raich*, 545 U.S. at 39 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421–22 (1819)).  These "phrases are not merely hortatory," but reflect a solemn command to the Court.  *Id.*  (citing *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992)).  Among other things, a regulation is not "proper for carrying into Execution the Commerce Clause when it violates a constitutional principle of state sovereignty," *id.*, "undermine[s] the structure of government established by the Constitution," *NFIB*, 567 U.S. at 559, or marks a novel or "substantial expansion of federal authority" into areas traditionally reserved to individuals or to the states. *See id.*

The CTA is both a novel expansion of federal authority and intrudes into areas traditionally reserved to states.  As explained above, Congress does not have the power to charter corporations for general purposes nor regulate state-granted corporate charters.  That has been a function of states since the Founding.  Nor has the federal government previously required entities to disclose personal, sensitive information for storage in a purpose-built law enforcement database.

While not dispositive, "sometimes 'the most telling indication of a severe constitutional problem . . . is the lack of historical precedent'" for the federal action. *NFIB*, 567 U.S. at 549 (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)).  "At the very least, we should 'pause to consider the implications of the Government's arguments' when confronted with such new conceptions of federal power." *Id.* at 550 (quoting *Lopez*, 514 U.S. at 564.)  At the preliminary injunction phase, this constitutional doubt should be sufficient to grant relief.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007).

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED BY THE CTA.

Plaintiffs have also sufficiently established irreparable harm.  To begin, the enforcement of an unconstitutional law is a *per se* irreparable harm.  *See BST Holdings L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  Thus, to the extent the Court concludes that the CTA is likely unconstitutional, irreparable harm is satisfied as a matter of law.

Even if this were not the case, however, the mandatory disclosure of private information and the unrecoverable costs of complying with the CTA are sufficient to establish irreparable injuries.  Once disclosed, private information cannot be undisclosed, and the CTA provides no mechanism for removing information from the database.  Moreover, due to sovereign immunity, any time and money Plaintiffs spend filing such disclosures will be wholly unrecoverable.  These injuries are sufficient to establish irreparable harm.  *Wages & White Lion Investments, LLC v. United States FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (regulatory compliance costs are unrecoverable and therefore amount to irreparable harm).

20

## III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION AND STAY

Plaintiffs also meet the two remaining equitable factors for preliminary relief. When a party is suing the government, the remaining equitable factors "merge" and largely collapse with the likelihood of success on the merits.  See *Nken v. Holder*, 556 U.S. 418, 435 (2009).  This makes sense.  It is black-letter law that the government is "not injured" by an injunction of an unconstitutional law.  *Trans World Airlines v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990).  And "the public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022).

Even if this were not the case, the equities clearly favor preliminary relief here. If preliminary relief is granted, the only effect on the government will be a delayed report.  By contrast, if preliminary relief is denied, Plaintiffs will be forced upon threat of significant criminal penalties to disclose private information to federal law enforcement before January 1, 2025.  Once disclosed, that information cannot be undisclosed.  The constitutional injury will be permanent.  Relief is therefore necessary to maintain the status quo while this case is litigated.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests this Court enjoin Defendants from enforcing the CTA, and issue a stay pending review of the CTA implementing rule.

Date: September 17, 2024,          Respectfully submitted,

*/s/ Chance Weldon*
ROBERT HENNEKE
TX Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
TX Bar No. 24076767

cweldon@texaspolicy.com
CHRISTIAN TOWNSEND
TX Bar No. 24127538
ERIC HEIGIS
VA Bar No. 98221
eheigis@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:   (512) 472-2700
Facsimile:   (512) 472-2728

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed on September 17, 2024, and sent via certified mail, return receipt requested on September 18, 2024, to the following:

U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

Janet Yellen, in her official capacity as
Secretary of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

The Financial Crimes Enforcement Network
P.O. Box 39
Vienna, VA 22183

Andrea Gacki, in her official capacity as
Director of FinCEN
P.O. Box 39
Vienna, VA 22183

*/s/ Chance Weldon*
CHANCE WELDON

### Certificate of Conference

Because Defendants' counsel has yet to make an appearance, I have not been able to confer specifically on this Motion for Preliminary Injunction. I certify that on September 17, 2024, I attempted to confer via email with U.S. Department of Justice counsel for *Nat'l Small Bus. United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205 (N.D. Ala. Mar. 1, 2024) about the relief sought in the attached Motion for Preliminary Injunction as required by Local Rule CV-7(h). Counsel for that case informed me that attorneys in the Office of the U.S. Attorney for the Eastern District of Texas will handle this case. I attempted to reach by phone counsel at the U.S. Attorney for the Eastern District of Texas, Tyler Division. Counsel were unavailable to speak and the receptionist declined to give counsel's name or email address, so my co-counsel left a voicemail.

*/s/ Chance Weldon*
CHANCE WELDON

23