## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| SAMANTHA SMITH and ROBERT MEANS, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:24-cv-336-JDK |
| UNITED STATES DEPARTMENT OF THE TREASURY, et al., | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION FOR PRELIMINARY RELIEF

The Corporate Transparency Act mandates that millions of private entities formed under state law disclose sensitive personal information to federal law enforcement. The Act applies even to entities that are not alleged to be involved in a crime and to entities that are not engaged in interstate or foreign commerce. Failure to comply may result in fines, penalties, and imprisonment.

Plaintiffs are two individuals who formed LLCs under Texas law to hold real property in Texas. The LLCs do not buy, sell, or trade goods or services in interstate commerce or own any interstate or foreign assets. Plaintiffs challenge Congress's power to enact the Corporate Transparency Act and the rule issued by the Financial Crimes Enforcement Network (FinCEN) implementing the Act. Most immediately, Plaintiffs seek a preliminary injunction and stay prohibiting FinCEN from enforcing the new law.

1

Plaintiffs' suit is not the first to challenge the law.  Parties in multiple jurisdictions have sued to enjoin the enforcement of the CTA and its reporting rule, and courts have reached different conclusions about the law's constitutionality.  *See Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) (finding the CTA is likely unconstitutional); *Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024) (finding the CTA is unconstitutional and granting a permanent injunction); *Firestone v. Yellen*, 2024 WL 4250192 (D. Or. Sept. 20, 2024) (finding the CTA is likely constitutional); *Cmty. Ass'ns Inst. v. Yellen*, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) (same); Transcript of Oral Argument at 50, *Small Bus. Ass'n of Mich. v. Yellen*, No. 1:24-cv-00314-RJJ-SJB (W.D. Mich. Apr. 29, 2024) (denying motion for preliminary injunction for lack of irreparable harm), ECF No. 25.

The district court in *Texas Top Cop Shop, Inc. v. Garland* recently enjoined the enforcement of the CTA and stayed the compliance deadline for the rule while that case is pending.  2024 WL 5049220, at *37.  The court's order applies to all reporting companies, including Plaintiffs' LLCs here.  *See id.*  Defendants appealed the order and moved for a stay of the injunction, which a motions panel of the Fifth Circuit granted.  *Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5203138, at *3 (5th Cir. Dec. 23, 2024).  But the merits panel vacated the motions panel's order, re-instating the district court's injunction.  *Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5224138, at *1 (5th Cir. Dec. 26, 2024).  Last week, Defendants sought relief in the Supreme Court, requesting that the Court stay the district court's injunction or at a minimum to limit its scope to the parties in that case.  Application for Stay of the

Injunction at 39, *Garland v. Texas Top Cop Shop*, No. 24A653 (U.S. Dec. 31, 2024). The case remains pending at the Supreme Court.

Considering the uncertainty of the *Top Cop* injunction, the differences between the arguments presented in that case and the present action, and the uniqueness of the parties here, the Court proceeds to analyze Plaintiffs' motion for preliminary relief.

As explained below, the Court **GRANTS** the motion. The Corporate Transparency Act is unprecedented in its breadth and expands federal power beyond constitutional limits. It mandates the disclosure of personal information from millions of private entities while intruding on an area of traditional state concern. Defendants' argument in defense of the statute, moreover, relies on the "effects upon interstate commerce so indirect and remote that to embrace them . . . would  effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *United States v. Lopez*, 514 U.S. 549, 557 (1995) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Because "[t]he Constitution creates a Federal Government of enumerated powers," the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the CTA and its implementing rule are unconstitutional. *Id.* at 552.

The Court also finds that Plaintiffs will be irreparably harmed if they are forced to comply with the new law and that the balance of equities and public interest favor an injunction and stay.

# I.

## A. The Corporate Transparency Act

On January 1, 2021, Congress passed the Corporate Transparency Act ("CTA") as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("Defense Authorization Act").  Pub. L. No. 116-283, 134 Stat. 3388, §§ 6401–03 (codified as amended at 31 U.S.C. § 5336).

As noted above, the CTA requires millions of private entities to provide detailed ownership information on an ongoing basis to FinCEN, a bureau of the U.S. Department of the Treasury.   According to the CTA, it was "the sense of Congress" that "more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year"; most States "do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities"; and "malign actors" and "money launderers" take advantage of the situation to "evade detection" by law enforcement.   Defense Authorization Act § 6402(1)–(4).  A federal law was therefore necessary to:

> (A) set a clear, Federal standard for incorporation practices;
>
> (B) protect vital United States national security interests;
>
> (C) protect interstate and foreign commerce;
>
> (D) better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and
>
> (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.

*Id.* § 6402(5).

To accomplish these objectives, the CTA defines and regulates a class of entities called "reporting companies." *See* 31 U.S.C. § 5336(a)(11)(A). A "reporting company" is a "corporation, limited liability company, or other similar entity that is created by the filing of a document with a secretary of state . . . under the law of a State or Indian Tribe or formed under the law of a foreign country and registered to do business in the United States." *Id.* Twenty-three types of entities are excluded from the "reporting company" definition, including banks, public accounting firms, non-profit entities, certain domestically-owned entities that have not sent or received more than $1,000 or changed ownership in more than a year, and companies making "more than $5,000,000 in gross receipts or sales" and employing "more than [twenty people] on a full-time basis" at a "physical office within the United States." *Id.* § 5336(a)(11)(B).

The CTA requires reporting companies to disclose information about their "beneficial owners" and "applicants." A "beneficial owner" is an individual who owns at least twenty-five percent of a reporting company or otherwise exercises substantial control over it. *Id.* § 5336(a)(3). And an "applicant" is the individual who files the documents forming a reporting company under state law or registers it to do business in the United States. *Id.* § 5336(a)(2). A reporting company must provide its beneficial owner's and applicant's "legal name, date of birth, residential or business address, and driver's license number or other 'unique identifying number'" from a nonexpired, government-issued identification document. *Id.* § 5336(a)(1), (b)(2)(A).

The CTA delegates authority to FinCEN to implement the statute.  *Id.* § 5336(b)(5).  In September 2022, FinCEN published a final rule ("the Reporting Rule") establishing the CTA's compliance requirements and deadlines.  87 Fed. Reg. 59498 (Sept. 30, 2022) (codified at 31 C.F.R. pt. 1010).  The Reporting Rule originally required most reporting companies to submit the required information to FinCEN by January 1, 2025.[1]  *See* 31 C.F.R. § 1010.380(a)(1)(iii).  For entities formed on or after January 1, 2024, the deadline to file the information is approximately 90 days from formation.  *Id.* § 1010.380(a)(1)(i)–(ii).  The Rule also requires companies to provide an image of a beneficial owner's or applicant's identification document as well as information about the reporting company itself, such as its taxpayer identification number, legal name, trade name, and address of its principal place of business.  *Id.* § 1010.380(b)(1).

Reporting companies must update their reports within one year of "a change with respect to any" ownership information.  *Id.* § 5336(b)(1)(D).  FinCEN will maintain the information in a database to aid nationwide law enforcement efforts, preserving the information for at least five years after a reporting company terminates.  *Id.* § 5336(c)(1).  FinCEN may share ownership information with other federal agencies upon request and with state and local law enforcement agencies upon a court order.  *Id.* § 5336(c)(2)(B)(i).  In an effort to protect sensitive information,

---

[1] Since the merits panel of the Fifth Circuit re-instated the *Top Cop* injunction, FinCEN has noted that the deadline is presently suspended.  *Beneficial Ownership Information*, FINCEN, https://www.fincen.gov/boi (last updated Jan. 2, 2025).  But as already noted, the Supreme Court is currently weighing the Department's request to stay the injunction.  Application for Stay of the Injunction at 39, *Top Cop*, 24A653.

the CTA requires FinCEN to take precautions against inappropriate disclosure.  *Id.*
§ 5336(c)(2)(C).

As one court noted, failure to comply with the reporting requirement is
"fraught with peril."  *Top Cop*, 2024 WL 5049220, at *8.  The CTA criminalizes
(1) providing false or fraudulent information, (2) "willfully fail[ing] to report complete
or updated beneficial ownership information," and (3) improperly disclosing
beneficial ownership information.  31 C.F.R. § 5336(h)(1)–(2).  Violators face a civil
penalty of up to "$500 for each day that the violation continues or has not been
remedied."  *Id.* § 5336(h)(3)(A)(ii).  They may also be fined up to $10,000 and
imprisoned for up to two years.  *Id.*

### B. The Parties

Plaintiffs Samantha Smith and Robert Means are Texans subject to the CTA's
reporting requirements.  *See* Docket No. 7-1 ¶¶ 6–15; Docket No. 7-2  ¶¶ 1–12.  Smith
formed Sage Rental Properties, LLC under Texas law to own and operate a single
rental property located in Austin, Texas.  Docket No. 7-1 ¶¶ 1–7.  Means formed 2367
Oak Alley, LLC under Texas law to own and operate a single office building in Tyler,
Texas.  Docket No. 7-2 ¶¶ 2–6.  Neither LLC engages in interstate commerce or holds
any interstate or foreign assets.  Docket No. 1 ¶ 43; Docket No. 7-2 ¶ 4.  Smith and
Means are each the beneficial owners of their LLCs, and because they filed the
incorporation documents with the Texas secretary of state, they are also the
applicants for their respective entities.    Docket No. 7-1 ¶¶ 11–12; Docket
No. 7-2 ¶¶ 10–11.  Neither Plaintiff has filed a beneficial ownership report with
FinCEN, but they are required to do so.  *See* Docket No. 7-1 ¶ 14; Docket No. 7-2 ¶ 13.

Plaintiffs filed this lawsuit challenging the constitutionality of the CTA and the Reporting Rule. They request that the Court preliminarily enjoin the enforcement of the CTA against them and temporarily stay the Reporting Rule under 5 U.S.C. § 705 while this litigation is pending. Docket No. 7 at 6.

## II.

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Courts apply a nearly identical four-factor test to requests for both preliminary injunctions and stays pending review under 5 U.S.C. § 705. *Compare Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (analyzing preliminary injunction factors), *with Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016) (analyzing factors for a stay under 5 U.S.C. § 705). As goes one test, so goes the other. Thus, to obtain both kinds of preliminary relief, Plaintiffs must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Jordan*, 823 F.3d at 809. The last two elements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As explained below, the Court finds that Plaintiffs are entitled to the preliminary relief they seek.

## A. Likelihood of Success on the Merits

Plaintiffs argue that the CTA and the Reporting Rule exceed Congress's enumerated powers.  Docket No. 7 at 11–12.  In response, the Department relies primarily on Congress's power to regulate interstate commerce and, secondarily, its powers to regulate foreign commerce, conduct foreign affairs, and lay and collect taxes.  Docket No. 13 at 11, 21–23.

Before addressing this disagreement, the Court notes several "first principles." *Lopez*, 514 U.S. at 552.  "The Constitution creates a Federal Government of enumerated powers." *Id.* (citing U.S. CONST. art. 1, § 8).  These powers are "few and defined." *Id.* (quoting THE FEDERALIST NO. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)); *see also United States v. Butler*, 297 U.S. 1, 63 (1936) ("The question is not what power the federal government ought to have, but what powers in fact have been given by the people.").  The powers of state governments, in contrast, are "numerous and indefinite." *Lopez*, 514 U.S. at 552.  "This constitutionally mandated division of authority 'was adopted by the Framers to ensure protection of our fundamental liberties.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).  Indeed, "[j]ust as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.  Thus, if Congress's chosen measures "are prohibited by the constitution," or if Congress passes "laws for the accomplishment of objects not intrusted to the government," it becomes "the painful duty of this tribunal" to enjoin

the law's application to Plaintiffs. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423 (1819); *see also Top Cop*, 2024 WL 5049220, at *26 (Courts have the responsibility to enjoin the enforcement of statutes exceeding Congress's enumerated powers "as 'mere acts of usurpation' which 'deserve to be treated as such.'" (quoting *NFIB v. Sebelius,* 567 U.S. 519, 559 (2012))).

As explained below, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim.[2]

## 1. Interstate Commerce Clause

The Constitution vests Congress with the exclusive power "[t]o regulate Commerce . . . among the several states." U.S. CONST. art. I, § 8, cl. 3. The Commerce Clause was originally understood to have a "relatively limited reach." *Lopez*, 514 U.S. at 590 (Thomas, J., concurring). "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *Id.* at 585–86 (Thomas, J., concurring) (citing multiple contemporary sources); *see also United States v. Rife*, 33 F.4th 838, 842 (6th Cir. 2022)

---

[2] Plaintiffs bring both a facial and as-applied challenge here. Docket No. 14 at 18–19. When a plaintiff argues that a law violates his constitutional rights both facially and as-applied, "courts generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (analyzing challenge to a university's harassment policies as violating the First Amendment rights of plaintiff and other similarly-situated professors). Conversely, when a litigant challenges a law as exceeding "Congress's enumerated powers, under our precedents the court first asks whether the statute is unconstitutional on its face." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting) (citing *United States v. Morrison*, 529 U.S. 598 (2000); *City of Boerne v. Flores*, 521 U.S. 507 (1997); and *United States v. Lopez*, 514 U.S. 549 (1995)); Luke Meier, *Facial Challenges and Separation of Powers*, 85 IND. L.J. 1557, 1558 (2010) ("[F]ederal courts are constitutionally compelled to consider the constitutionality of a statute on its face when the power of Congress to pass the law has been challenged."). Because Plaintiffs challenge the CTA and Reporting Rule as exceeding the powers of Congress, the Court considers their facial challenge first. And because Plaintiffs are likely to succeed on that challenge, as explained herein, the Court need not address Plaintiffs' as-applied challenge. *See Lopez*, 514 U.S. at 551 (addressing facial challenge only).

("'Commerce,' at that time, meant 'trade' or economic 'intercourse,' which consisted of 'exchange of one thing for another,' 'interchange,' or 'traffick.'" (quoting 1 S. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 422 (6th ed. 1785))).  The term "was used in contradistinction to productive activities such as manufacturing and agriculture." *Lopez*, 514 U.S. at 586 (Thomas, J., concurring); *see also* Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. CHI. L. REV. 101, 113 (2001) [hereinafter Barnett, *Commerce Clause*] (noting that "the term 'commerce' was consistently used in the narrow sense and that there is no surviving example of it being used in either source in any broader sense").  Not only does the Constitution use the word "commerce" "in a narrower sense than our case law might suggest," "it also does not support the proposition that Congress has authority over all activities that 'substantially affect' interstate commerce."  *Lopez*, 514 U.S. at 587 (Thomas, J., concurring).

Nevertheless, the Supreme Court's interpretation of the Commerce Clause "has drifted far from the original understanding." *Id.* at 584 (Thomas, J., concurring). In *Lopez*, the Court "identified three broad categories of activity that Congress may regulate under its commerce power."  *Id.* at 558; *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 628 (5th Cir. 2003).  The first two categories tracked the original understanding of the Clause.  "First, Congress may regulate the use of the channels of interstate commerce." *Lopez*, 514 U.S. at 558; *GDF Realty*, 326 F.3d at 628.  And second, Congress may regulate the "instrumentalities of interstate commerce, or

persons or things in interstate commerce." *Lopez*, 514 U.S. at 558; *GDF Realty*, 326 F.3d at 628.

But the third category departed from the original meaning of the Clause. Citing its caselaw, the Supreme Court in *Lopez* noted that Congress may also regulate "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558; *GDF Realty,* 326 F.3d at 628. This third category—commonly called the substantial effects test—arises under the Necessary and Proper Clause in art. I, § 8, cl. 18, because it only indirectly regulates interstate commerce. *Terkel v. Ctrs. for Disease Prevention & Control*, 521 F. Supp. 3d 662, 670 (E.D. Tex. 2021), *appeal dismissed as moot without vacating judgment*, 15 F.4th 683, 685 (5th Cir. 2021); *Gonzales v. Raich*, 545 U.S. 1, 34 (2005) (Scalia, J., concurring) (noting that "unlike the channels, instrumentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone").

### a.

The CTA does not regulate the channels or instrumentalities of interstate commerce.

Channels of interstate commerce are "the interstate transportation routes through which persons and goods move." *United States v. Bailey*, 115 F.3d 1222, 1226 (5th Cir. 1997) (quoting *United States v. Parker*, 911 F. Supp. 830, 842 (E.D. Pa. 1995)). The Fifth Circuit has noted that the list includes, but is not limited to, "highways, railroads, air routes, navigable rivers, fiber-optic cables and the like."

*United States v. Robinson*, 119 F.3d 1205, 1210 (5th Cir. 1997); *see also* Barnett, *Commerce Clause*, *supra*, at 123 (noting that the legislators at the Virginia ratification debates were deeply concerned with the need to "defend our commerce" in shipping lanes from other seafaring nations (quoting Jonathan Elliot, 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 43 (Taylor & Maury 2d ed 1863))).   An example of Congress's regulating this category is prohibiting the interstate "shipment of stolen goods." *Perez v. United States*, 402 U.S. 146, 150 (1971) (citing 18 U.S.C. §§ 2312–15).

Instrumentalities of interstate commerce, on the other hand, are the "planes, trains, and automobiles" of commerce, as well as "the persons associated with them." *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 2024 WL 3357841, at *13 (N.D. Tex. July 10, 2024) (citing *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005)).   An example of this power is Congress's prohibition of the willful destruction of "any aircraft . . . used, operated, or employed in interstate, overseas, or foreign air commerce."   18 U.S.C. § 32(a)(1); *Lopez*, 514 U.S. at 558.

The CTA regulates private companies formed under state law, not the channels or instrumentalities of interstate commerce.   *See* 31 U.S.C. § 5336(a)(11).   As other courts have noted, "[t]he word 'commerce' or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA."   *Top Cop*, 2024 WL 5049220, at *19 (quoting *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1278).   A company is not a channel or instrumentality of commerce because it is not a pathway of commerce or an item moving in commerce.   *See id.* (citing *Lopez*, 514 U.S. at 558–

59).  If it were—if a private company were considered a channel or instrumentality of commerce—"then Congress could regulate any company, in any way, all the time."  *Id.*  And no court has adopted "such a capacious construction of the words 'channel' and 'instrumentality.'"  *Id.* (citing *Lopez*, 514 U.S. at 558–59).

The Department's argument to the contrary is unavailing.  The Department contends that the CTA combats "the misuse of the instrumentalities and channels of commerce."  Docket No. 13 at 13.  And because "[e]ntities constituting CTA reporting companies utilize the channels of interstate commerce," the CTA may regulate them. *Id.* at 20.  The Department cites *American Power & Light Co. v. SEC* and *North American Co. v. SEC*, but neither case supports the proposition that Congress can regulate an entire class of entities merely because an undefined subset of those entities may use the channels of interstate commerce.  *See Am. Power & Light Co.*, 329 U.S. 90 (1946); *N. Am. Co.*, 327 U.S. 686 (1946).  In fact, these two cases addressed Congress's power under the Commerce Clause to enact the Public Utility Holding Act of 1935, a statute "directed solely to public utility holding company systems that use the channels of interstate commerce."  *Am. Power & Light Co.*, 329 U.S. at 100; 49 Stat. 803 (repealed 2005).  The Supreme Court held that the statute fell within Congress's Commerce Clause power because the statute expressly applied only to entities that used the channels of interstate commerce.  *Am. Power & Light Co.*, 329 U.S. at 97–98; *N. Am. Co.*, 327 U.S. at 698 (noting that "Congress has effectively" limited the statute's reach "to those holding companies that are in fact in the stream of interstate activity").

14

The CTA, in contrast, includes no such limitation.  Rather, the statute regulates a vast array of companies formed under state law regardless of whether those companies are "in the stream of interstate activity."  31 U.S.C. § 5336(a)(11)(B); *N. Am. Co.*, 327 U.S. at 698.  The Department asserts that the statutory exemption for certain inoperative entities indicates that Congress sought to "capture businesses that are engaged in economic activity."  Hearing Tr. 12/6/2024 at 24:21–22.  But the exemption does not apply unless the entity has existed for at least a year and has not "experienced a change in ownership or sent or received" more than $1,000 in the preceding twelve months.  31 U.S.C. § 5336(a)(11)(B)(xxiii).  Thus, a new LLC that has never used the channels or instrumentalities of commerce would still be subject to the CTA's reporting requirements—and penalties—for a year at the minimum.  *See id.*  At $500 per day, that is $182,500 in civil penalties for the offense of merely creating an LLC and failing to provide the requested information to FinCEN.  *Id.* § 5336(h)(3)(A).

"The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions."  *Sebelius*, 567 U.S. at 557.

### b.

Nor does the CTA regulate "activities that substantially affect interstate commerce."  *Lopez*, 514 U.S. at 558; *GDF Realty,* 326 F.3d at 628.

To determine whether a purely intrastate activity substantially affects interstate commerce, the Court should consider the following:  (1) the economic

15

nature of the regulated activity, (2) the presence of a jurisdictional element limiting the statute's application to instances affecting interstate commerce, (3) any Congressional findings about the effect of the regulated activity on interstate commerce and its necessity to a broader regulatory scheme, and (4) the attenuation of the link between the regulated activity and its effect on interstate commerce, if any. *See GDF Realty*, 326 F.3d at 628–29 (citing *Morrison*, 529 U.S. at 609–12); *see also Groome Res., Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 204–05 (5th Cir. 2000); *Terkel*, 521 F. Supp. 3d at 670. The Court should also review the purported exercise of constitutional authority "in the light of our dual system of government" and should not extend its reach to embrace activities that "would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 557; *see also Sebelius*, 567 U.S. at 537 (holding that any invocation of the "substantial effects" power must be considered "carefully to avoid creating a general federal authority akin to the police power").

  1. **Economic activity.** Although there is not "a categorical rule against aggregating the effects of any noneconomic activity," the Supreme Court has "upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *GDF Realty*, 326 F.3d at 635 (quoting *Morrison*, 529 U.S. at 613). Accordingly, the Court first considers whether the activity regulated by the CTA is economic.

In its most basic form, "quintessentially economic" activity is "the production, distribution, and consumption of commodities." *Raich*, 545 U.S. at 26 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 720 (1966)); *see also GDF Realty*, 326 F.3d at 629 (defining "commerce" as "[t]he exchange of goods and services" or "[t]rade and other business activities" (quoting *Commerce*, BLACK'S LAW DICTIONARY (7th ed. 1999))). While the outer edges of "economic activity," are difficult to trace, *see Lopez*, 514 U.S. at 566–67 (noting the line drawing problem), precedent provides useful guidance. Courts have held, for example, that the production of wheat for home consumption is a commercial activity, *Wickard v. Filburn*, 317 U.S. 111, 129 (1942); the production and possession of marijuana are economic activities, *Raich*, 545 U.S. at 26; the commercial removal of asbestos is an economic activity, *United States v. Ho*, 311 F.3d 589, 602 (5th Cir. 2002); and discriminating against disabled individuals in the purchase, sale, and rental of housing is an economic activity, *Groome*, 234 F.3d at 205–06. Courts have also held, in contrast, that gun possession near a school is not an economic activity, *Lopez*, 514 U.S. at 561; gender-motivated violence is not an economic activity, *Morrison*, 529 U.S. at 613; removing insects from a cave is "neither economic nor commercial" activity, *GDF Realty*, 326 F.3d at 639; and invoking state eviction proceedings to remove a tenant is not an economic activity, *Terkel*, 521 F. Supp. 3d at 672.

In considering this question, the Court looks "only to the expressly regulated activity," not the activity's downstream consequences or possible economic motivations. *GDF Realty*, 326 F.3d at 634. Here, Plaintiffs argue that the CTA

regulates "filing papers with a secretary of state to form a corporate entity."  Docket No. 7 at 16.  And, Plaintiffs contend, this is not "by itself" an economic activity.  *Id.*  The Court agrees.  Filing formation papers is not "the production or use of a commodity that is traded in an interstate market."  *Terkel*, 521 F. Supp. 3d at 671.  Nor is it the exchange or trade of goods or services.  *See GDF Realty*, 326 F.3d at 629.  Rather, filing formation documents with a state government is more akin to evicting a tenant under state law, *Terkel*, 521 F. Supp. 3d at 671, or possessing a firearm near school property, *Lopez*, 514 U.S. at 561.  Although these activities may be motivated by economic interests or have downstream economic effects, they are not themselves "economic in material respect."  *Terkel*, 521 F. Supp. 3d at 671.  And, as Plaintiffs note, individuals may file corporate formation documents for myriad reasons—many of which may have nothing to do with "'commerce' or any sort of economic enterprise."  *Lopez*, 514 U.S. at 561.

The Department argues that the regulated activity is "the anonymous operation of entities as an ongoing concern."  Hearing Tr. 12/6/2024 at 30:10–11; *see also Top Cop*, 2024 WL 5049220, at *20.  But, as the *Top Cop* court held, the CTA does not regulate the "operation" of private entities.  2024 WL 5049220, at *20–22.  In fact, the only two instances of the term "operation" in the statute refer to *FinCEN's* operations, *31 C. F. R. § 5336(c)(11)(A)(i), (iv)(I)*, and all uses of "operating" or "operator" relate to the exempt categories.[3]  Rather, the CTA regulates any (non-

---

[3]  *See, e.g.*, *id.* § 5336(a)(11)(B)(xiii) (exempting insurance companies with "an operating presence at a physical office within the United States"), (xiv) (exempting "commodity pool operators"), (xvii) (exempting pooled investment vehicles "operated or advised by" certain financial institutions and

exempt) entity formed under state law for any purpose.  And because inactive entities are still reporting companies for at least a year after a change of ownership or a transaction over $1,000, a new company need not "operate" at all to be regulated by the CTA.  *Id.* § 5336(a)(11)(B)(xxiii).

More accurately, the CTA regulates the *existence* of entities formed under state law, presupposing that they will eventually engage in economic activity.  But existence is not an activity covered by the substantial-effects prong of Commerce Clause jurisprudence.  *See Sebelius*, 567 U.S. at 556–57 (refraining from buying health insurance is not an activity regulable under the Commerce Clause); *Top Cop*, 2024 WL 5049220, at *21.  As the *Top Cop* court noted, corporate existence "is the natural, idle state that any entity formed by registering with a secretary of state necessarily takes on by virtue of its registration.  It is akin to a person simply being alive in their natural state."  2024 WL 5049220, at *21.  Although many reporting companies may "predictably engage in particular transactions," moreover, "[t]he proposition that Congress may dictate the conduct of an [entity] today because of prophesied future activity finds no support in our precedent."  *Sebelius*, 567 U.S. at 557.

Accordingly, this first consideration cuts against the CTA's constitutionality as a necessary and proper exercise of Congress's commerce authority.  *See Morrison*, 529 U.S. at 613.

---

brokers), (xx) (exempting entities that "operate[] exclusively to" assist nonprofits and political organizations), (xxi) (exempting large businesses with a physical "operating presence" in the United States).

2.    **Jurisdictional element.**    The CTA notably "has no express jurisdictional element which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562.    While not dispositive, including a jurisdictional hook is "standard operating procedure for Commerce Clause legislation for good reason—'it precludes any serious challenge to the constitutionality of the money laundering statute as beyond the Commerce power, because it guarantees a legitimate nexus with interstate commerce.'"    *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1286 (quoting *United States v. Goodwin*, 141 F.3d 394, 400 (2d Cir. 1997)).    Not only does the CTA lack any jurisdictional hook, but the reach of the statute is also expansive, regulating every private entity in the country unless it falls within a few specific exemptions. *See generally* 31 U.S.C. § 5336.    This factor thus also indicates that the CTA is not a proper exercise of Congress's commerce power.

3.    **Congressional findings.**    While "Congress need not make particularized findings in order to legislate," *Lopez*, 514 U.S. at 563 (quoting *Perez v. United States*, 402 U.S. 146, 156 (1971)), "congressional findings are certainly helpful . . . , particularly when the connection to commerce is not self-evident." *Raich*, 545 U.S. at 21.    Indeed, as one court explained, when a statute purports to regulate "noneconomic, intrastate activity, helpful findings would demonstrate that the regulation is 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'"    *Terkel*, 521 F. Supp. 3d at 673 (quoting *Lopez*, 514 U.S. at 561).    But

20

findings alone are "not sufficient" to justify an unconstitutional act as compliant with the Commerce Clause. *Morrison*, 529 U.S. at 614. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* In *Morrison*, for example, Congress provided "numerous findings" that gender-motivated violence affected interstate commerce. *Id.* (quoting H.R. REP. NO. 103-711, at 385 (1994) (Conf. Rep.)). But those findings were "substantially weakened by the fact that they rel[ied] so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.* at 615. The same is true here.

In the CTA's "Sense of Congress" section, Congress stated that many new entities are formed throughout the country each year, and that "malign actors" use some of these entities to hide financial crimes. Defense Authorization Act § 6402. Congress also stated that this "lack of transparency" is "a primary obstacle to tackling financial crime," H.R. REP. NO. 116-227, at 10 (2019) (Conf. Rep.), and that ownership information about the entities would help "protect interstate and foreign commerce," Defense Authorization Act § 6402(5). But malign actors may use almost any method to conceal their crimes. And no one would argue that the Constitution allows Congress to regulate any individual, entity, or method merely because the regulation may make crime more difficult to conceal. As another court already noted, moreover, these vague findings are insufficient to demonstrate that the CTA fills an essential gap in a broader regulatory scheme of economic activity. *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1284–86 (finding that the CTA is a "single-subject statute whose

21

single subject is itself non-economic" and that the CTA is "far from essential" given other existing laws and regulations).

Taken together with the CTA's regulation of noneconomic activity and the lack of a jurisdictional element reining in the statute's reach, this factor also cuts against the CTA's constitutionality. *See Morrison*, 529 U.S. at 614.

    **4.    Link between activity and commerce.**  Finally, *Morrison* instructs courts to consider the link between the regulated activity and interstate commerce. 529 U.S. at 612.  Here, the connection between the formation, ownership, or existence of a corporate entity and interstate commerce is attenuated.  *See id.*; *Lopez*, 514 U.S. at 563–67; *Terkel*, 521 F. Supp. 3d at 674.

As noted above, forming or owning an entity under state law "does not alone have a self-evident substantial effect on interstate commerce." *Terkel*, 521 F. Supp. 3d at 674.  And because corporate formation and ownership—or the mere existence of a corporate entity—are not alone economic, their effects cannot be aggregated.  *See id.*; *GDF Realty*, 326 F.3d at 638.  Further, the CTA's disclosure requirements are not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561; *see also Nat'l Small Bus. United*, 721 F. Supp. 3d at 1284–86; *Terkel*, 521 F. Supp. 3d at 674.  The Department contends that the CTA "fill[s] a gap in the federal government's comprehensive anti-money laundering scheme."  Docket No. 13 at 12. But the link between the formation or mere existence of an entity and money laundering is too weak to support the weight of this expansive statute.  *Nat'l Small*

*Bus. United*, 721 F. Supp. 3d at 1283–84 ("Thus, '[n]o matter how inherently integrated' corporate formation is with the activities of those entities, 'they are not the same thing: They involve different transactions, entered into at different times, with different' parties." (quoting *Sebelius*, 567 U.S. at 558)).

The Department's position, moreover, lacks a limiting principle. *See Morrison*, 529 U.S. at 614. If Congress can regulate an entity simply because it exists, then it can regulate anything—or anyone—at all. It could, for example, require all homeowners to register their homes in a federal database to prevent their properties from being used as stash houses for drug trafficking organizations. Or it could require all mask owners to register their ownership and submit a mask photo to ensure they cannot conceal their involvement in a federal crime. The Supreme Court has warned against this kind of "but-for causal chain" because it would allow Congress to "completely obliterate the Constitution's distinction between national and local authority." *Morrison*, 529 U.S. at 615; *Lopez*, 514 U.S. at 557; *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1284. Even in *Wickard*, "which is perhaps the most far-reaching example of Commerce Clause authority over intrastate activity," Congress was regulating wheat, a fungible commodity regularly traded in interstate commerce, not every farmer who could potentially grow wheat. *Lopez*, 514 U.S. at 560; *see also Top Cop*, 2024 WL 5049220, at *25. Indeed, if accepted, the Department's reasoning would allow Congress to intrude upon "other areas of traditional state regulation," ignore the "distinction between what is truly national and what is truly local," and bestow upon Congress a "plenary police power that would

authorize enactment of every type of legislation." *Morrison* 529 U.S. at 616–17; *Lopez*, 514 U.S. at 566.

*    *    *

Accordingly, all four of the *Morrison* considerations caution against upholding the CTA as a necessary and proper exercise of Congress's interstate commerce power.

## 2. Other Enumerated Powers

The Department also briefly asserts that the CTA is a "necessary and proper exercise of Congressional authority to carry into execution other powers," including regulating foreign commerce, regulating foreign affairs, and laying and collecting taxes. Docket No. 13 at 20–23. The Court disagrees. The Constitution's Necessary and Proper Clause, found in art. I, § 8, cl. 18, justifies an act of Congress only where it involves "exercises of authority derivative of, and in service to," an enumerated power. *Sebelius*, 567 U.S. at 560; *see also United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring) ("When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain."). And here, the CTA is not derivative of any of the other enumerated powers identified by the Department.

### a.

The Department first contends that the CTA is necessary and proper "[t]o regulate Commerce with foreign Nations." Docket No. 13 at 20–21 (quoting U.S. CONST. art. I, § 8, cl. 3).

As noted above in discussing Congress's power to regulate interstate commerce, the term "Commerce" at the Founding meant "trade" or economic "intercourse," which consisted of the "exchange of one thing for another," "interchange," or "traffick." *Rife*, 33 F.4th at 842 (quoting 1 S. Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE 422 (6th ed. 1785)); *see also id.* (noting that the Federalists and Antifederalists alike "distinguished 'commerce' from manufacturing and agriculture" (citing THE FEDERALIST NO. 36 (Alexander Hamilton))). "Commerce" did not include "productive activities such as manufacturing and agriculture." *Lopez*, 514 U.S. at 586 (Thomas, J., concurring). And although this original understanding arguably supports two of the three "categories of activity" that Congress may regulate under the Interstate Commerce Clause, it does not support the third category—"activities that substantially affect interstate commerce." *Id.* at 558.

Eighty years have passed since the Supreme Court recognized the third category. And yet the Court "has not extended it to Congress's power to regulate under the Foreign Commerce Clause." *Rife*, 33 F.4th at 843; *see also Baston v. United States*, 580 U.S. 1182, 1183 (2017) (Thomas, J., dissenting from denial of certiorari) (noting that the Supreme Court "has never thoroughly explored the scope of the foreign commerce clause"). Nor has the Fifth Circuit. This means that the original meaning of the Foreign Commerce Clause governs here. *See Williams v. Homeland Ins. Co.*, 18 F.4th 806, 818 (5th Cir. 2021) (Ho, J., concurring) ("[W]e decide every case faithful to the text and original understanding of the Constitution, to the maximum extent permitted by a faithful reading of binding precedent." (citation omitted)); *Rife*,

33 F.4th at 843–44 (noting that, "absent binding precedent," the "Constitution's original meaning is law" and declining to "add to the Foreign Commerce Clause the revisionist structure that, 80 years ago, the Supreme Court added to the Interstate Commerce Clause").

The analysis is uncomplicated. The CTA does not regulate foreign trade or commerce itself. Nor does it regulate the channels or instrumentalities of foreign commerce. *See supra* Section II.A.1. The Department argues that Congress's authority to regulate foreign commerce is more expansive than its interstate commerce power. Docket No. 13 at 21. But the Department cites only a single case— *Japan Line, Ltd. v. Cnty. of Los Angeles*—in which Justice Blackmun stated in dicta that "the Founders intended the scope of the foreign commerce power to be the greater." 441 U.S. 434, 448 (1979). As the Sixth Circuit held in analyzing *Japan Line*, "in that comparison the Founders surely did not have the current interstate-commerce power in mind." *Rife*, 33 F.4th at 844. Certainly, no case has interpreted the Foreign Commerce Clause as expansively as the Department seeks here.

Accordingly, the CTA is likely not a necessary and proper exercise of Congress's foreign commerce power.

### b.

The Department also contends that the CTA is a necessary and proper exercise of Congress's power to regulate foreign affairs and national security. Docket No. 13 at 21–22.

26

"Congress's foreign affairs powers are not express in Article I . . . , other than the clauses stating that Congress may 'regulate commerce with foreign nations,' 'Establish an uniform Rule of Naturalization,' 'declare war,' 'raise and support armies,' 'provide and maintain a navy,' and 'make rules for the [G]overnment and regulation of the land and naval forces.'" *Top Cop*, 2024 WL 5049220, at *28 (quoting U.S. CONST. art. I., § 8, cls. 3, 4, 11, 12, 13, 14). Certainly, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1964), and courts must defer to the political branches' decisions on foreign policy. *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Well-meaning "deference in matters of policy cannot, however, become abdication in matters of law." *Sebelius*, 567 U.S. at 538.

The Court agrees with the courts in *Top Cop* and *National Small Business United*, both of which addressed the foreign affairs power at length. *See Top Cop*, 2024 WL 5049220, at *27–31; *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1273–77. As those courts noted, forming and owning a company under state law are "purely internal affairs," even though some foreign actors may in some cases bend "those internal affairs to illicit ends." *Nat'l Small Bus. United*, 721 F. Supp. at 1275, *accord Top Cop*, 2024 WL 5049220, at *28 ("These entities, though special under the CTA as reporting companies, remain 'creatures of state law.'" (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977))). And in matters of internal affairs, Congress remains limited by its enumerated powers in Article I. *United States v. Curtiss-*

*Wright Exp. Corp.*, 299 U.S. 304, 315–16 (1936).  The Department, moreover, fails to cite any history or precedent holding that the regulation of entities created under state law is "derivative of, and in service to" Congress's enumerated foreign affairs power.  *See Sebelius*, 567 U.S. at 560; *see also Top Cop*, 2024 WL 5049220, at *29–30 (distinguishing the Department's cited cases from the CTA).  While complying "with international standards may be good policy," the Necessary and Proper Clause does not give Congress unlimited authority to impose federal standards on matters of state concern just because a state's law differs from the standards set by foreign nations. *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1276 (noting that "'no agreement with a foreign nation,' formal or informal, 'can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution'" (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957))).

The CTA is thus likely not a necessary and proper exercise of Congress's foreign affairs powers.

### c.

Finally, the Department argues that the CTA is a necessary and proper exercise of the Government's authority to lay and collect taxes.  Docket No. 13 at 22; Docket No. 16 at 8–9.

The Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. CONST. art. 1, § 8, cl. 1.  And Congress's taxing power undoubtedly has been interpreted broadly.  *See United States v. Kahriger*, 345 U.S. 22, 28 (1953) (noting that it "is axiomatic that the power of Congress to tax is

extensive"). But the CTA likely cannot be upheld as a necessary and proper exercise of Congress's taxing power.

The Department wisely does not argue that the CTA imposes a tax. *See Nat'l Small Bus. United*, 721 F. Supp. 3d at 1288 (finding the CTA is not a tax). Instead, it contends that the CTA is necessary to aid the Government's ability to collect other taxes. Docket No. 16 at 8–9. And because Congress's taxing power includes "the power to ensure collection of taxes" even in the absence of a concurrent tax, the Department argues, the CTA is justified because the CTA itself states that it would be "highly useful" in detecting tax fraud and improving tax administration generally. *Id.*

This is an expansive—and unsupported—view of the taxing power. As the court held in *National Small Business United*, "[i]t would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." 721 F. Supp. 3d at 1289 (quoting *Sebelius*, 567 U.S. at 560). Interpreting the Necessary and Proper Clause this broadly would justify "any law that provided for the collection of information useful for tax administration and provided tax officials with access." *Id.* The Department, moreover, cites no case upholding a similar law as a necessary and proper exercise of Congress's taxing power. *See Sebelius*, 567 U.S. at 549 ("Legislative novelty is not necessarily fatal . . . . But sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action." (cleaned up)); *see also Top Cop*, 2024 WL 5049220, at *31–33;

*cf. also Comstock*, 560 U.S. at 150 (Kennedy, J., concurring) (warning that inferences made pursuant to the Necessary and Proper Clause must be "controlled by some limitations" or else "congressional powers [can] become completely unbounded by linking one power to another *ad infinitum* in a veritable game of 'this is the house that Jack built'" (quoting Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), *reprinted in* 31 THE PAPERS OF THOMAS JEFFERSON 547 (Oberg ed. 2004))).

Accordingly, the Court finds that the CTA is likely not a necessary and proper exercise of Congress's taxing power.

## B. Risk of Irreparable Harm

Having established that Plaintiffs are likely to succeed on the merits, the Court next determines whether they have shown a substantial risk of irreparable injury if a preliminary injunction is not granted. *Jordan*, 823 F.3d at 809. An irreparable harm requires demonstrating "harm for which there is no adequate remedy at law." *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022) (citation omitted). Plaintiffs have made such a showing here.

Compelling individuals to comply with a law that is unconstitutional is irreparable harm. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("For individual petitioners, the loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 2024 WL 3381901, at *6 (N.D. Tex. July 11, 2024) (noting that "the potential to infringe on constitutional rights" is "per se irreparable injury"); *Top Cop Shop*, 2024 WL 5049220, at *15 ("[I]f Plaintiffs must comply with an unconstitutional law, the

bell [of irreparable harm] has been rung.").  And, as noted above, Plaintiffs have demonstrated that the CTA is likely unconstitutional.

Additionally, incurring unrecoverable costs of compliance with federal law constitutes irreparable harm.  *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  And, here, Plaintiffs must expend money to comply with the reporting requirements of the CTA, which is unlikely to be recovered since "federal agencies generally enjoy sovereign immunity for any monetary damages." *Id.*; Docket No. 7-1 at 3–4; Docket No. 7-2 at 3–4.  Compliance with the CTA also requires Plaintiffs to provide private information to FinCEN that they otherwise would not disclose.  Docket No. 7-1 at 4; Docket No. 7-2 at 4.  The disclosure of such information is a type of harm that "cannot be undone through monetary remedies." *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012); *Top Cop*, 2024 WL 5049220, at *15 ("Absent injunctive relief, come January 2, 2025, Plaintiffs would have disclosed the information they seek to keep private . . . . That harm is irreparable.").

Accordingly, the second factor weighs in favor of a preliminary injunction and stay here.

### C. Balance of the Equities and the Public Interest

The third and fourth factors require the Court to weigh the harms and public interest in granting or denying Plaintiffs' preliminary injunction request.  Because these "factors merge when the Government is the opposing party," the Court considers them together. *Nken*, 556 U.S. at 435.

The injuries likely to occur absent a preliminary injunction and stay easily outweigh any harm in granting Plaintiffs' request.  Without relief, "Plaintiffs will almost certainly incur substantial, incompensable monetary costs and constitutional harm." *Top Cop*, 2024 WL 5049220, at *34; Docket No. 7-1 at 4; Docket No. 7-2 at 3–4.  The Department, on the other hand, faces at most a modest delay in receiving the beneficial ownership information.  To be sure, the government often suffers a form of irreparable harm when a law is enjoined.  *See Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024).  But the government has no interest in enforcing a law that violates the Constitution.  *See id.* ("[N]either [the Department] nor the public has any interest in enforcing a regulation that violates federal law." (citation omitted)).

Nor would a preliminary injunction or stay disserve the public interest.  Public interest is not harmed by preventing the enforcement of unconstitutional laws and unlawful rules.  *See id.*; *Top Cop*, 2024 WL 5049220, at *34 ("Indeed, 'it is always in the public interest to prevent a violation of a party's constitutional rights.'" (citation omitted)); *Texas v. Becerra*, 2024 WL 3297147, at *11 (E.D. Tex. July 3, 2024) ("[T]he public interest 'always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve.'" (citation omitted)).

In short, "the government/public-interest analysis collapses with the merits" analysis because the Court has concluded that the CTA is likely unconstitutional. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251 (5th Cir. 2023), *rev'd and remanded on other grounds*, 602 U.S. 367 (2024); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013) (Jackson, J.) (explaining that "public

interest arguments" are "derivative of . . . merits arguments and depend in large part on the vitality of the latter"). It follows that the Department and the public will not be injured by an injunction temporarily enjoining a law that violates the Constitution.

Accordingly, the third and fourth factors weigh in favor of a preliminary injunction and stay here.

### III.

For the reasons stated above, the Court finds that Plaintiffs' motion for preliminary relief should be granted: they have demonstrated that the CTA and its implementing rule are likely unconstitutional, that they face a substantial risk of irreparable harm absent an injunction, and that the balance of equities and public interest support preliminary relief. Therefore, Plaintiffs' motion is **GRANTED**.

The Supreme Court has instructed that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Plaintiffs in this case are two individuals who have moved under Federal Rule of Civil Procedure 65(a) for the Court to preliminarily enjoin the Department from enforcing the CTA against them. Docket No. 14 at 20. Given that the CTA is likely unconstitutional, granting Plaintiffs' request would "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702. Accordingly, the Department is hereby **ENJOINED** from enforcing the CTA (31 U.S.C. § 5336) against Plaintiffs Samantha Smith and Robert Means and their related entities while this lawsuit is pending.

33

Regarding the Reporting Rule, Plaintiffs have moved for a stay pending review under 5 U.S.C. § 705.  Docket No. 14 at 20.  The Administrative Procedure Act authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "And 'nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited' to the parties before the Court."  *Texas v. Becerra*, 2024 WL 4490621, at \*1 (E.D. Tex. Aug. 30, 2024) (cleaned up) (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)).  Instead, "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."  *Career Colls.*, 98 F.4th at 255; *see also id.* ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))).  Accordingly, the Court **STAYS** the effective date of the Reporting Rule (31 C.F.R. § 1010.380) while this lawsuit is pending.  *See id.*; 5 U.S.C. § 705; *see also All. for Hippocratic Med.*, 78 F.4th at 254 (affirming a stay under § 705 because "a stay is the temporary form of vacatur" under § 706).

34

So **ORDERED** and **SIGNED** this **7th**  day of **January, 2025.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE